My name is Gregory Warner and I'm appearing on behalf of the Gannons, the appellants in this case. I would like to start out by just giving an overview, I think three important areas that need to be focused on with respect to this appeal and one is the history of the Agricultural Credit Act and as pointed out earlier it was for the purpose of helping the farmers and in the history of that act is that there was a class action that preceded it and that the agency's USDA was not carrying out the options that it had to refinance farmers and so the ACA enacted mandatory debt relief programs and they are mandatory and the language is shallow so it's it's very definite. When you say they're mandatory, they're mandatory on the farmers? Mandatory on the government to... The farmers had an option. Yes, they could they could reject the debt servicing if they wish but the mandatory part was to... They could have gone to Chapter 12. Certainly they could but mandatory to give them the best relief possible under the act to ensure that they would stay on the farm. That's the purpose I believe and I think it's set forth well in the Agricultural Credit Act. The second area is the history of this particular case in which the agency refused to follow its own agency regulations in the servicing of the debt of the appellants in this case and they started out with a series of dollars analysis which was the computerized program to determine which relief they were eligible. But the agency could decide at what level of the agency it will determine when a contract is one that they want to enter into. They don't have to accept everything that happens at the state level or the local level. And you know what happened is they had a number of agreements. They got sent up to the chain of command and people at the chain of command's word authority said no, no, no. Finally on the fourth Friday, that's when it worked. That's your... You were going to get to that argument, right? That's what you were getting at. Can I speak to that? Sure. Yes. I believe, Your Honor, a look at the record it's unquestioned that the first dollars analysis that resulted in a write-down on March 7th of 1989, a write-down of $354,000 was accepted in writing by the borrowers was approved by the state office. But it wasn't approved to follow up the chain. And it wasn't actually executed. I mean, they eventually signed a different agreement. I don't believe it requires approval beyond the state office. And I think the testimony in the record establishes that because that very question was asked by the hearing officer at the hearing officer's hearing. And he asked what is required to authorize the implementation of this first dollar analysis. Did they go ahead and insist on signing that agreement? Did they go into court and say, look, we want this thing now and we're not going to put in anything else? They waited patiently for the FSA to come forth with it. They went through another one and eventually they signed the fourth one. But they weren't getting notices of these interim dollars analysis. If they thought the first one, they should have insisted on it. They could have maybe gone into district court at that time and cited this very provision that you're citing and said they are required to sign this agreement. But for them to go ahead and sign something else and then ten years later come in and say, oh, we wanted the deal that we should have gotten, that doesn't work. I think what the record shows is that the borrowers believed that they were getting the deal that they had originally been offered. And there's... They got the deal that they signed. They have the deal that they signed. If they thought it was as good a deal as the first one, then there's no harm, no foul. If it's different, then they shouldn't have signed it. They should have gone to district court right then and said, look, we have a deal. We have it enforceable. The district court should force the secretary to sign that deal. And he would have had that matter resolved at that point. How can he come ten years later and say we want the four deal... I think it's important to consider in the whole context of this case the issues raised, and particularly with respect to Estoppo. And when we talk about affirmative misconduct, I think those are all elements. And what this shows is... Well, we can talk about those things, but I think what you were arguing, I think what you argued in your brief, is you had a deal. You had a deal the first time around. Well, it's black leather contract law that if you have a deal and then you sign a second deal on exactly the same issue, it's a new deal. It's innovation. You've restructured the deal. So even if you had a deal the first time around, which I think is highly debatable, in the end, you clients signed a different contract on different terms on exactly the same subject matter. So even if you had a deal to begin with, it was superseded by a later agreement between the same parties on the same subject matter. It's gone. If you didn't want to do that, the thing to have done is to have taken the first deal to court and said, look, we have a deal. The Secretary is refusing to sign. The District Court issued a mandate mandamus forcing the Secretary to sign. And then you've had that deal. Maybe. How is this superseded by the deal you actually signed, your clients actually signed? Because they were not given the notice that's required by the FSA regulations that they had. They had approved the first deal in writing. The regulations were very clear that they submit to them a new dollars analysis, which there is no record of them ever having done. They had no way of knowing what was going on with this shared appreciation agreement. All they were getting was an agreement shoved in front of them This is why we have lawyers in courts. This was 1990. Believe you me, there were District Courts then. They've been around for many years. It seems like a long time ago, but they were in operation. You hire a lawyer, you go to court. You don't know what your rights are under the law. That's what you do. That's how we do things in this country. We're not disputing the fact that they signed that agreement and that is the only signed agreement here. We're not taking any I mean, even assuming you had a deal to begin with, which I think is highly questionable, when your clients then sign a subsequent deal dealing with exactly the same subject matter with exactly the same party on different terms why does that as a simple matter of contract law supersede any prior deal they might have had? You have reconstituted the contract. Let's say you had a contract. So what? You have now It's like going to the bank. You have one loan and you agree to a different loan. Let's say you have a 20-year loan. You go to the bank and negotiate a 30-year loan. At that point, you can't go back and say, oh, I want my deal on a 20-year loan. That thing is gone. I don't think this is your best case. This is your best issue. And it's not our only issue, Your Honor. Right. I may move on. You've got 11 minutes and 52 seconds. Right. You've got a better argument on the 10-year versus 20-year business. Yes, and I want to go on to that, of course. And the agreement that was given to them provided for a 20-year term and the record is clear that the terms of this contract were discussed at length between the representative of the FSA and the borrowers. Yeah, but that doesn't matter much. The important thing is that the agency has no authority to enter into a 20-year contract. And it's our position... It can't do it. It has no authority. So what is the consequence of the fact that the agency enters into a contract as to which it has no authority to enter with respect to material term? What happens now? I think the basic contract law says that if it is an essential term in the agreement, the agreement is unenforceable in its entirety. Okay. Then where are you back to? Back to owing the debt you owed before, right? Well, we cited some case authority. It's Montana case authority that says that you leave the parties where you find them. If money has changed hands, it's changed hands, but they take no action to put the parties back in the previous position. I think what you probably need to argue is it's not of our business. Exactly. What we would hold is this is not a deal. What happens next is a different lawsuit for a different court. That's probably your position. What about the fact that your clients are presumed to know the law and when they sign this contract and the contract said 20, they're presumed to know that 20 meets 10. They're presumed to know the agency can't enter into a contract that's longer than 10 years and therefore they are charged with the knowledge that really all they had was a 10-year contract. Well, again, I think that the implementation, there was a great deal of confusion in how this act was implemented and it was certainly true in my client's case and they had no way of knowing that the contract, which was a pre-printed form, it has FMHA instruction. Well, if they did have a way of knowing it, they could have looked up, they could have hired a lawyer, they could have, I mean, the thing about people being presumed to know the statute, it is not a description of actual reality. I would guess that most people who are lawyers in this country don't know this, or haven't known what this particular statute provides. Only the very few who actually deal with this issue. Yet, the way we operate is we say people are presumed to know the law and they're presumed to know the law because they can't find out these things are public, they can inform themselves and because there's really no other way to run a government. Assuming that farmers are poor and they're barely bankrupt and they can't afford a lawyer, nonetheless, can this court enforce an illegal contract? I don't believe so. So there's no authority here regardless of whether they knew it was illegal or not. We can't enforce that contract. I don't believe so. That's why I asked you the question. It may not be any of our business but sometimes you get what you ask for. So I'm asking, what would you get if the contract were declared unenforceable? What would the agency do? I couldn't speculate. I mean, I couldn't hazard. What would you do? Where would it leave your clients in your view? In my view, I think our position is, as is stated in our brief, is that the courts, either in this action or a subsequent action, would have to leave the parties where they find them. There have been write-downs imposed. There are outstanding obligations. They are making those payments on those obligations. But those would now be gone. Void. They remain pursuant to a potentially void contract. If we were to find it void. Anything to prevent the government from saying, okay, well, we've got these loan papers back here in the back door and such a great deal for us because now you owe us more money. We'd recapture all those write-downs. That's why I'm asking the question because one option is that maybe it really was a typographical error and you'd be better off with a 10-year term than with no agreement. I think in the context of contract enforcement, I think you have to look at equity. I think equity is a factor here. And I think it takes you back to what should these borrowers have gotten at the time. And yes, this does require us to go back. But that would be to me what would be equitable in this case. But we can't do that here. So I just need to know is your bottom line that you would like us to declare if you were to prevail, declare the contract of 20 years to be a void contract? I don't think we can say otherwise. I think the contract clearly has a void essential term in it. Well, I mean, what you really want is a 20-year contract. We can't have that. That's not permissible. No court can deal with you. Congress can't go back. We might not really want a 20-year contract because then you'd have this appreciation. You might have a worse situation. It is a more onerous provision, as we have pointed out. But of course, our clients were told as well as everyone else that there would be no recapture at the end. And their whole purpose was we can hang on for 20 years. Were they part of the class in the 8-second case? Pardon me? No, they were not. They were not part of the class? No. But you saw what the 8-second did with that. Yes. Yes. Assuming they don't that we're not going to disagree, I'm not saying we're not, but just assuming we don't disagree with the 8-second on that issue, what is it your clients want? What is it your clients want that we could possibly give them? Well, as we set forth in our brief, we believe that the provisions of the shared appreciation agreement has sought to be enforced by the government at this time are unenforceable and that there should be no shared appreciation recapture due at this time. Okay, but let's say we don't agree with you because two other circuits, and let's just assume we were to follow their logic, that there is recapture due if you take the agreement and the statute of parts charge. Yes, maybe I was confusing. I'm not saying that the agreement, that's based on the premise that the agreement is unenforceable because of its illegal term. Well, if the agreement were unenforceable, then you would have no agreement at all and we wouldn't be talking about recapture and appreciation, would we? No. We'd be just talking about your first loan agreement with the government. Exactly, yes. Okay, so let's say now
judges: D Nelson, Kozinski, McKeown